# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JANE DOE, a minor, by next friend )
MARY DOE, and MARY DOE, )
individually, )
                     )
       Plaintiffs, )
                     )
v. )        Case No. 3:25-cv-00683
                     )        Judge Aleta A. Trauger
TENNESSEE STATE UNIVERSITY, )
TAMARA BARNHILL, in her individual )
capacity, MELISSA ASHMORE, in her )
individual capacity, ALTIE JORDAN, in )
her individual capacity, )
MINI ROCKSTARS CHILD CARE )
CENTER, CO., MINI ROCKSTARS )
CHILD CARE & ENRICHMENT )
CENTER, INC., and )
WILLIAM ROBINSON, )
                     )
       Defendants. )

## <u>MEMORANDUM</u>

Before the court is the Motion to Dismiss (Doc. No. 43) filed by defendants Melissa Odom

(formerly known, and named in this lawsuit, as Melissa Ashmore), Tamara Barnhill, and Altie

Jordan (collectively, the "Individual Defendants"), and Tennessee State University ("TSU")

(collectively with the Individual Defendants, the "State Defendants"), seeking dismissal of the

plaintiffs' claims under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.[1] The

plaintiffs oppose the motion.

---

[1] The Motion to Dismiss also references Rule 12(b)(2) (*see* Doc. No. 43 at 1), which pertains to motions to dismiss for lack of personal jurisdiction. The State Defendants' Memorandum makes no reference to Rule 12(b)(2), and the court clearly has personal jurisdiction over the defendants.

For the reasons set forth herein, the motion will be granted in part and denied in part, and Counts Four and Five of the revised Second Amended Complaint will be dismissed.

## I.   PROCEDURAL HISTORY

Plaintiffs Mary Doe and Jane Doe filed this lawsuit on June 19, 2025. (Doc. No. 1.) Jane Doe, a minor, brings her claims by and through her next friend and legal guardian, Mary Doe. After the State Defendants sought dismissal of the Complaint, the plaintiffs timely filed the First Amended Complaint ("FAC") as a matter of course. (Doc. No. 37.) The State Defendants' Motion to Dismiss targeting the FAC was filed shortly thereafter, along with a supporting Memorandum of Law and one exhibit (Doc. Nos. 44, 44-1). The plaintiffs thereafter filed a Second Amended Complaint without leave of court or the defendants' consent. That filing was stricken as improperly filed. (*See* Doc. No. 62.)

The plaintiffs then filed their Response in Opposition to the State Defendants' Motion to Dismiss (Doc. No. 66) contemporaneously with a renewed Motion to Amend (and attached proposed revised Second Amended Complaint) (Doc. No. 67), in which the plaintiffs explained that amendment was necessary to respond to certain arguments raised in the Motion to Dismiss. The plaintiffs specifically asserted, however, that the proposed revised Second Amended Complaint would not moot the Motion to Dismiss and that the court could rule on the pending motion without requiring the State Defendants to file yet another motion. The State Defendants opposed the motion on the grounds of futility but otherwise recognized that they suffered no prejudice from the proposed amendment, as long as it was not deemed to moot their pending Motion to Dismiss. (Doc. No. 73.) The State Defendants filed a Reply in further support of their Motion to Dismiss (Doc. No. 74) that basically incorporates the statement of facts set forth in the plaintiffs' Response. The court thereafter granted the Motion to Amend (Doc. No. 76), and the

revised Second Amended Complaint ("SAC") (Doc. No. 77) was docketed separately and is now the operative pleading.[2]

## II.    FACTS ALLEGED IN SAC

### A.    The Parties

Mary Doe is the legal guardian and aunt of three-year-old Jane Doe. (SAC ¶¶ 3–4.) TSU is a non-profit state university. (*Id.* ¶ 5.) Defendant Barnhill is the director of TSU's Early Head Start ("EHS") program; defendant Odom is TSU's Family & Community Engagement Coordinator; and defendant Jordan is TSU's EHS Child Care Partnership Assistant Director. (*Id.* ¶¶ 5–9.) Also named as defendants are Mini Rockstars Child Care Center ("Mini Rockstars")[3] and former Mini Rockstars employee, William Robinson. (*Id.* ¶¶ 9–11.) This case involves the alleged abuse and sexual abuse of Jane Doe while she was enrolled at Mini Rockstars through TSU's EHS program.

### B.    TSU's EHS Program

TSU administers an Early Head Start partnership program ("EHSPP"). (*Id.* ¶ 29.) TSU funds its EHSPP through federal grants pursuant to the Improving Head Start for School Readiness Act, 42 U.S.C. §§ 9831 *et seq.*, which grants TSU receives and administers. (*See* SAC ¶¶ 18, 30.) The United States Department of Health and Human Services ("DHS") issues grants to public entities like TSU and private for-profit and non-profit entities administering EHSPPs ("Early Head Start agencies"). (*Id.* ¶¶ 19–20 (citing 45 C.F.R. §§ 1301–1305).) TSU partners with existing local childcare providers to provide EHS services on the childcare providers' premises. (SAC ¶ 20.)

---

[2] The parties' briefing primarily references the FAC. The court refers herein only to the SAC, unless cross-reference to the FAC is necessary.

[3] Apparently unsure as to which entity is the correct one, the plaintiffs name as defendants both Mini Rockstars Child Care Center, Co. and Mini Rockstars Child Care & Enrichment Center, Inc.

### C. Jane Doe's Experience Enrolled in Mini Rockstars' EHS Program

When Jane Doe began living with Mary Doe in 2022, Jane Doe was already attending Mini Rockstars, and Mary Doe enrolled her in the EHS program at Mini Rockstars. (*Id.* ¶¶ 38, 40.) Within just a few months, Mary Doe became concerned about Jane Doe's care at Mini Rockstars, because she would come home with unexplained "marks, bumps, and bruises." (*Id.* ¶ 41.) On one occasion, Jane Doe came home with a black eye. (*Id.* ¶ 46.) Although one of Jane Doe's teachers, Darshereia Williams, claimed that Jane had tripped and fallen "over her own feet," Jane Doe began saying that evening that "Momo" had pushed her. (*Id.* ¶ 46.) "Momo" is what Jane Doe called her other teacher, Ruthie Williams. (*Id.*)

Throughout Jane Doe's enrollment at Mini Rockstars in 2023, Mary Doe had multiple conversations with Odom, documenting her concerns about Jane Doe's care, including her concern about the black eye and Mini Rockstars' failure to provide an incident report or to take any responsibility for the incident. In response, Odom claimed that she would investigate the black eye, but she failed to follow up with Mary Doe about this. (*Id.* ¶¶ 49, 52.) However, Odom also began the process of "aging up" Jane Doe—that is, moving her to the older class at Mini Rockstars. (*Id.* ¶ 50.) Jane Doe was moved to the older class in November 2023. Defendant William Robinson, whom Jane Doe called "Mr. Will," and Linda Robinson taught the older class.[4] (*Id.* ¶¶ 50, 55.)

In March and April 2024, Mary Doe began observing multiple injuries on Jane Doe's body, "including a bite mark on her back, scratches on her belly, and bruising in between her legs." (*Id.* ¶ 57.) At the same time, Jane Doe began saying she was scared and did not want to go to school.

---

[4] The SAC does not explain the relationship between Will Robinson and Linda Robinson, if any.

(*Id.* ¶ 56.) Mary Doe asked Mini Rockstars about each injury, but Jane Doe's teachers denied knowledge of their cause or any related incidents.

Also around April 2024, Jane Doe reported to Mary Doe that Mr. Will had "placed her" and at least one other female child on the toilet. Mary Doe was concerned about this, both because she had told Mini Rockstars she was not ready to toilet-train Jane Doe yet and because she was under the impression that only female staff would assist female children with toileting. Linda Robinson told her that Mr. Will had not put her on the toilet and that only she had been involved in changing Jane Doe's diapers. (*Id.* ¶¶ 60–61.) Mary Doe also reported her concerns about these issues to Odom, who brushed off her concerns and told her there was no reason why Mr. Will should not assist with putting Jane Doe on the toilet. (*Id.* ¶ 62.)

Over the next few months, Jane Doe began exhibiting unusual behavior. On July 14, 2024, based on comments made and behavior exhibited by Jane Doe, Mary Doe reported to the Tennessee Department of Children's Services ("DCS") that she believed that Jane Doe had been sexually abused by Mr. Will. (*Id.* ¶ 74.) Mary Doe also informed Odom about Jane Doe's "disclosures" on July 15, 2024. (*Id.* ¶ 87.)

On a call the next day, Odom asked Mary Doe why she had reported the allegations to DCS, and Mary Doe responded that she was a mandated reporter.[5] (*Id.* ¶ 89.) Odom appeared to Mary Doe to be "upset" that she had reported possible abuse to DCS. (*Id.*) In the same call, Odom asked Mary Doe if Jane Doe would stay at Mini Rockstars or transfer to another center.[6] Mary

---

[5] As the State Defendants point out, everyone in Tennessee is a mandated reporter when it comes to suspected child sexual abuse. *See* Tenn. Code Ann. §§ 37-1-403, 37-1-605.

[6] Mary Doe does not state whether Jane Doe ever attended Mini Rockstars after she reported suspected abuse to DCS or whether, instead, she withheld Jane Doe from attending. The State Defendants infer, and ask the court to infer, that Odom asked Mary Doe if Jane Doe would transfer to another center *because* Mary was withholding Jane from attendance. (*See* Doc. No. 74 at 2.)

Doe responded that "she needed to wait for the conclusion of the investigation and DCS's recommendations before making any decisions." (*Id.* ¶ 90.)

In a call on July 24, 2024, Odom again repeatedly asked Mary Doe if Jane Doe would "remain" at Mini Rockstars,[7] and Mary Doe repeated that she needed to wait for the conclusion of the investigation before making a decision. (*Id.* ¶ 91.) In a call a week later, Odom called Mary Doe and "stated something to the effect of, 'Due to the nature of [Jane Doe]'s allegations and the wellbeing of our staff, TSU EHS has decided that Jane Doe will no longer be a student at Mini Rockstars. You can transfer her to a new school within our program, or we will end our services for you." (*Id.* ¶ 92.) Mini Rockstars had not yet ceased operations (*id.*), and Mary Doe interpreted this call as "threatening Jane Doe's removal from the TSU EHS program entirely in retaliation for Mary Doe's report to DCS" (*id.* ¶ 94). In addition, Mary Doe claims that Jane Doe was "expelled" from Mini Rockstars and that the expulsion was in retaliation for Mary Doe's having reported suspected sexual abuse to DCS (*Id.* ¶¶ 93–94.)

Regardless, "within weeks" of DCS's opening an investigation on July 15, 2024, Mini Rockstars "shut down completely." (*Id.* ¶ 104.) The SAC does not identify the date on which Mini Rockstars closed, other than to claim that it was after Jane Doe was "expelled." Mary Doe alleges that she found out about the closure through a text message from another parent. (*Id.* ¶ 104.)

### D. Jane Doe Transfers to Trinity Way's EHS Program

At some point, despite Jane Doe's allegedly being "expelled" from Mini Rockstars and the "threat" of removal from the program altogether, Mary Doe "agreed to transfer" Jane Doe to

---

[7] Again, although the SAC uses the term "remain" (*see* SAC ¶ 91 ("Ms. Odom continued to repeatedly question Mary Doe about whether Jane Doe would *remain* at Mini Rockstars.")), the defendants characterize Odom's query as asking whether Jane Doe "would *return* to Mini Rockstars" (Doc. No. 74 at 2), implying that Jane Doe was not attending Mini Rockstars at the time she was "expelled."

another TSU EHS "Program Partner Site," Trinity Way Enrichment Center ("Trinity Way"). (*Id.* ¶ 108.) This was the only other program TSU had available. (*Id.* ¶ 109 & n.1.) After Mary Doe agreed to the transfer, Odom assured her that no former Mini Rockstars staff would be re-employed at any of TSU's partner programs. (*Id.* ¶ 108.)

However, when Mary Doe toured Trinity Way in September 2024, the schools' director, Katina Henderson, mentioned that she was hiring former staff from Mini Rockstars to be teachers in the classroom in which Jane Doe would be placed. (*Id.* ¶ 110.) Mary Doe told Henderson that she would not be comfortable with Jane Doe's being in a classroom with any of Mini Rockstar's former staff "because of Jane Doe's disclosures of abuse and sexual abuse." (*Id.* ¶ 111.) Mary Doe disclosed that Will Robinson was the target of a DCS investigation. (*Id.*)

Shortly after her meeting with Henderson, Mary Doe received "frantic" messages from Odom asking her to schedule a meeting with Odom and Altie Jordan "as soon as possible." (*Id.* ¶ 112.) This meeting took place by Zoom the next day. During the meeting both Jordan and Odom "reprimanded" Mary Doe for informing Henderson about the investigation into Mini Rockstars and expressed concern about the effect of the disclosures on TSU's reputation. (*Id.* ¶ 113.) Odom and Jordan told Mary Doe she "could not discuss Jane Doe's abuse with anyone connected to the TSU EHS program" and that, if she did, they could remove Jane Doe from the EHS program "to protect the safety of the centers they partner with." (*Id.* ¶ 114.) Odom and Jordan made it clear to Mary Doe that she could only express any concerns she had to them directly, in order to allow them to "control the narrative." (*Id.*) Mary Doe understood this prohibition as a "restraint on her speech" in an effort to "protect TSU and its partner sites from legal liability and/or reputational harm, not to protect Jane Doe." (*Id.* ¶ 115.)

Odom and Jordan also promised her that "Trinity Way would have nothing to do with Mini Rockstars." (*Id.* ¶ 116.) Six months later, however, despite those assurances, Henderson informed Mary Doe in early March 2025 that Trinity Way was hiring Ruthie Williams and Darshereia Williams (the "Williams sisters")—the former Mini Rockstars teachers Jane Doe claimed had pushed her. (*Id.* ¶ 117.) Mary Doe asked Henderson to "contact TSU" regarding these two teachers. (*Id.* ¶ 118.) She feared retaliation if she provided Henderson any additional information, due to Odom's and Jordan's prohibition on speaking about Jane Doe's experiences at Mini Rockstars. (*Id.* ¶ 119.) Henderson later reported to Mary Doe that she had spoken to TSU and was told that TSU had "no reservations" about her hiring the Williams sisters. When Henderson asked Mary Doe for more information, Mary Doe told her that she was "not allowed to say anything more." (*Id.* ¶ 120.)

Mary Doe also contacted TSU directly to express her concerns about the "new hires" from Mini Rockstars. She learned the same day that the Williams sisters were on Trinity Way's campus that day and had "hugged and held Jane Doe" while they were there. (*Id.* ¶ 122.)

The same day, around March 6, 2025, Jane Doe happened to have a therapy appointment. Due to comments and behavior exhibited by Jane Doe during that session, the therapist "filed another DCS report." (*Id.* ¶ 126.)

Approximately one week later, on March 14, 2025, Mary Doe had a conference call with Barnhill and Jordan. During this call, Mary Doe "discussed the abuse Jane Doe experienced at Mini Rockstars and the need to protect [her] from the perpetrators of her abuse." (*Id.* ¶ 127.) Mary Doe also discussed TSU's "restraint" on her ability to speak about her and Jane Doe's experiences. (*Id.* ¶ 128.) Barnhill was dismissive of Mary Doe's concerns. Both Barnhill and Jordan told her that, because the first DCS investigation was "closed" and because the Williams sisters had

"passed their background checks," there was no reason why Trinity Way should not hire them. (*Id.* ¶ 130.) Mary Doe repeated that she did not want Jane Doe to have further contact with "the individuals involved in her abuse at Mini Rockstars." (*Id.* ¶ 131.)

Despite Mary Doe's repeatedly expressed concerns, Henderson hired the Williams sisters. They were scheduled to begin working in Jane Doe's class the following week.[8] However, DCS opened another "case" against the Williams sisters and Will Robinson. (*Id.* ¶¶ 133–35.) Mary Doe "temporarily" withheld Jane Doe from school because she feared for her safety and well-being. (*Id.* ¶ 136.) It is unclear when she began withholding Jane Doe from Trinity Way.

On March 25, 2025, Henderson texted Mary Doe to ask if she planned to keep Jane Doe at Trinity Way. Mary Doe told her that she could not make that decision until the DCS investigation concluded and that she was "hoping to have some clarity from DCS this week on next steps." (*Id.* ¶ 137.) Mary Doe was apparently still withholding Jane Doe from Trinity Way at that time.

> Two weeks later, on April 7, 2025, Barnhill emailed Mary Doe, stating:
>
> I am reaching out regarding [Jane Doe's] enrollment in the Early Head Start program. Based on our previous communication, we understand that you've decided not to return her to the center at this time. While we respect your decision and acknowledge your concerns about the newly hired teachers, we regret to inform you that we are unable to continue holding her spot.
>
> Effective April 8, 2025, [Jane Doe] will no longer be enrolled in the Early Head Start program. As [Jane Doe] has now reached the age of three, she is eligible for Head Start services. If you would like more information about these services or have any questions, please feel free to reach out.

(Doc. No. 44-1.)[9] Mary Doe denies telling anyone at EHS or Trinity Way that she had "decided" not to return Jane Doe to the EHS program. (SAC ¶ 140.) Moreover, TSU does not offer Head

---

[8] Mary Doe does not indicate that the Williams sisters ever began teaching at Trinity Way, at least while Jane Doe was there.

[9] The State Defendants filed a complete copy of this email as an exhibit to their motion. (Doc. No. 44-1.) The court may consider it without converting their motion into a Rule 56 motion

Start services (as distinct from *Early* Head Start) and did not take steps to implement transition planning for Jane Doe. (*Id.* ¶ 146.) Mary Doe characterizes this letter as "expelling" Jane Doe from TSU's EHS program. (*Id.* ¶ 147.)

### E.  The Claims Against the State Defendants

Based on these allegations, the plaintiffs assert the following claims against the State Defendants: (1) First Amendment retaliation and prior restraint claims, under 42 U.S.C. § 1983, by Mary Doe, individually, against Odom, Jordan, and Barnhill, individually; (2) a First Amendment retaliation claim under § 1983 by Jane Doe (through Mary Doe as next friend) against Odom and Barnhill, individually; (3) a procedural due process claim under § 1983 by Mary Doe and by Jane Doe against Barnhill, individually; (4) a claim for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Pre-Assault Claim") by Jane Doe against TSU; (5) a Title IX claim ("Post-Assault Claim") by Jane Doe against TSU; and (6) a Title IX retaliation claim by Mary Doe and Jane Doe against TSU. (SAC at 23–31.)[10] The State Defendants seek dismissal of all of these claims.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted."

---

because the plaintiffs "referred to [it] in the Complaint," quoting from it at length in the SAC, and it is "central to the claims contained therein." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 695 (6th Cir. 2018) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

[10] The Pre-Assault and Post-Assault Title IX claims are also asserted against Mini Rockstars. In addition, the plaintiffs bring several state law claims against Mini Rockstars and Will Robinson individually. (SAC at 31–36.)

Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent*, 901 F.3d at 695.

### B. Rule 12(b)(1) – Standing

The State Defendants assert that Mary Doe lacks standing to bring her Title IX retaliation claim. A motion to dismiss for lack of standing is properly characterized as a motion to dismiss

for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008) (reviewing a dismissal for lack of standing under Rule 12(b)(1)).

To establish the threshold requirement of Article III standing at the pleading stage, the plaintiff bears the burden of alleging facts that clearly demonstrate that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To satisfy the "injury in fact" requirement, a plaintiff must allege that she has suffered an injury that is "'concrete, particularized, and actual or imminent.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

## IV.     ANALYSIS

### A.     Counts One and Two: Mary Doe's First Amendment Retaliation and Prior Restraint Claims Against Odom, Jordan, and Barnhill and Jane Doe's First Amendment Retaliation Claims Against Odom and Barnhill

The plaintiffs assert that Mary Doe engaged in constitutionally protected speech when she reported the sexual abuse of Jane Doe by Will Robinson to DCS and when she discussed the abuse Jane Doe had endured at Mini Rockstars with Henderson at Trinity Way. The plaintiffs claim that Odom's and Jordan's acts of "forb[idding] Mary Doe from discussing Jane Doe's abuse and threaten[ing] to remove Jane Doe from the Early Head Start program if Mary Doe discussed Jane Doe's abuse . . . created a prior restraint on Mary Doe's ability to engage in free speech." (SAC ¶ 154.) In addition, they assert that, after Mary Doe reported Jane Doe's abuse to TSU, Odom retaliated against her by "expelling" Jane Doe from Mini Rockstars (*id.* ¶¶ 89–92, 155); and after Mary Doe again "spoke out about Jane Doe's abuse and TSU's prior restraints on her speech," Barnhill "expelled Jane Doe from the TSU EHS Program in retaliation for Mary Doe's speech"

(*id.* ¶ 156). Based on these assertions, both Mary Doe and Jane Doe claim that they suffered retaliation in violation of the First Amendment.

### 1.    *Qualified Immunity*

The State Defendants' first argument for dismissal of these claims is that the Individual Defendants are entitled to qualified immunity. "Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a constitutional violation; and (2) that the right at issue was 'clearly established' when the event occurred." *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). "Both prongs must be met, and if either is not satisfied, "qualified immunity will shield the officer from civil damages." *Id.*

### a)    *Mary Doe's First Amendment Claims*

Here, the Individual Defendants claim that they are immune from suit on Mary Doe's claims, because "[t]here is no clearly established law that prohibits Odom, Jordan, or Barnhill from advising a guardian on communication protocols within an EHS program in this context." (Doc. No. 44 at 11.) Insofar as the defendants intend to target the prior restraint claim,[11] this argument misrepresents the factual allegations in the SAC. The plaintiffs do not allege that the Individual Defendants "advised" or counseled Mary Doe. They allege that the Individual Defendants "reprimanded" her, told her that she "could not discuss Jane Doe's abuse" with anyone outside TSU, told her she was "only allowed" to voice her concerns directly with TSU, and threatened

_____

[11] Retaliation and prior restraint claims are distinct claims under the First Amendment. *See Alexander v. United States*, 509 U.S. 544, 553–54 (1993) (recognizing the "time-honored distinction between barring speech in the future and penalizing past speech" and advising against "blur[ring] the line" between these claims). Although the plaintiffs do not label Count One as a First Amendment prior restraint claim, instead referencing only retaliation in the heading for the claim (*see* SAC at 23), they allege facts to support such a claim and clearly articulate the claim within Count One (*see id.* ¶ 154).

Jane Doe's removal from the program if Mary Doe did not comply with these directives. (SAC ¶ 114.) The court must accept the plaintiffs' allegations as true for purposes of the Motion to Dismiss, and the State Defendants do not contend that express directives of the type actually alleged in the SAC are insufficient to state a prior restraint claim under the First Amendment.

Regarding Mary Doe's retaliation claims, the defendants are simply incorrect in suggesting that the claims are based on the individual defendants' "advising" Mary Doe on "communication protocols." (Doc. No. 44 at 11.) Instead, Mary Doe's claim against Odom is that Odom "expelled" Jane Doe from Mini Rockstars in retaliation for Mary Doe's having reported suspected sexual abuse to DCS and threatened to expel her altogether from TSU's EHS program. (SAC ¶¶ 89–94; *see also id.* ¶ 155 ("After Mary Doe spoke out about Jane Doe's abuse, Ms. Odom expelled Jane Doe from Mini Rockstars.").) Then, after Mary Doe continued to speak out "about Jane Doe's abuse and TSU's prior restraints on her speech," Barnhill "expelled Jane Doe from the TSU EHS Program in retaliation for Mary Doe's speech." (*Id.* ¶ 156.) The Individual Defendants have not shown that they are entitled to qualified immunity as to these claims.

b)      *Jane Doe's First Amendment Claims*

Odom and Barnhill assert that they are entitled to qualified immunity from Jane Doe's First Amendment retaliation claims because, "[w]hile a party may enjoy protection from retaliation based on her own protected speech, it is not clearly established that she may maintain a claim for retaliation based on a relative's protected speech." (Doc. No. 44 at 11.) In support of this assertion, the defendants cite a Ninth Circuit case, *DeFrancesco v. Robbins*, 136 F.4th 933 (9th Cir. 2025), as holding that such a right is not clearly established and "analyzing cases from multiple circuits." (*Id.*)

*DeFrancesco*, indeed, cites cases from multiple circuits and, in doing so, expressly recognizes that the Sixth Circuit (among others) has "recognized that the First Amendment

prohibits retaliation against a public employee for a family member's conduct or speech." *DeFrancesco*, 136 F.4th at 941 (citing *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955-56 (6th Cir. 1993); *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 516–17 (6th Cir. 2017)).

While *Adkins* involved the right to intimate association and is not particularly relevant here, *Nailon* held that the first element of a First Amendment retaliation claim—the engagement in constitutionally protected speech—can be satisfied by a showing that "a relative has engaged in protected speech even if the plaintiff herself has not done so." *Nailon*, 715 F. App'x at 514. *Nailon* also held that it was "clearly established" at that time that a "a First Amendment retaliation claim may be based on speech made by a relative." *Id.* at 516–17 (citing *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 540–42 (6th Cir. 2003)); *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (Table), 1999 WL 623730 (6th Cir. Aug. 11, 1999)).

However, ten years before *Nailon* (and after both *Henley* and *Ward*), the Sixth Circuit had stated in a footnote in a published opinion, but without discussion or analysis:

> Because [plaintiffs] Jenkins and Mulkey are also pursuing [First Amendment retaliation] claims on behalf of [their children], the two children are also plaintiffs. Neither child presents a *prima facie* case because there is no evidence either engaged in any constitutionally protected speech, so the district court properly granted summary judgment on the claims by [the children].

*Jenkins v. Rock Hill Local School District*, 513 F.3d 580, 588 n.3 (6th Cir. 2008). Notwithstanding that assertion, the court again held in 2020, in yet another unreported case, that the right to bring a First Amendment retaliation claim based on a relative's speech is clearly established, for qualified immunity purposes, based on *Nailon* and *Henley*. *Fakhoury v. O'Reilly*, 837 F. App'x 333, 340 (6th Cir. 2020).

Admittedly, *Nailon*'s and *Fakhoury*'s reliance on *Henley* was somewhat misplaced, because, in that case, the parties simply "assumed that Plaintiffs [students] have satisfied the protected conduct element of Plaintiffs' burden by pointing to [their parents'] race discrimination

complaint to the Office of Civil Rights in December 1999," so the court did "not address this factor." *Henley*, 84 F. App'x at 540. And in *Ward*, the plaintiff parents brought First Amendment retaliation claims on their own behalf and on behalf of their minor children, and the court simply did not distinguish between these claims. *See Ward*, 1999 WL 623730, at *4 (noting that "[t]he impermissibility of retaliation is sufficiently well established that the defendants are not entitled to qualified immunity" and finding "ample evidence of Mrs. Ward's protected activities" and "obvious" "adverse action against her daughters").

Regardless, in March 2024, a district court relying on *Fakhoury* likewise concluded that it was "clearly established that 'a plaintiff may bring a First Amendment retaliation claim through a relative's protected speech.'" *Place v. Warren Loc. Sch. Dist. Bd. of Educ.*, No. 2:21-cv-985, 2024 WL 964253, at *5 (S.D. Ohio Mar. 6, 2024) (quoting *Fakhoury*, 837 F. App'x at 340), *case dismissed on appeal by stipulation of the parties*, No. 24-3279, 2024 WL 4481314 (6th Cir. July 30, 2024). In addition, this court observes that the Supreme Court has held in the Title VII context that an employee may bring a retaliation claim based on an adverse action against him taken in response to a close relative's protected activity. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 17 (2011). The Sixth Circuit had long before reached the same conclusion. *See E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 544 (6th Cir. 1993) ("[A] plaintiff's allegation of reprisal for a relative's antidiscrimination activities states a claim upon which relief can be granted under Title VII.").

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To determine if a right is clearly established, the court may look to "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Wenk v. O'Reilly*, 783

F.3d 585, 598 (6th Cir. 2015) (quoting *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 417 (6th Cir. 2011)). The "dispositive question is whether the violative nature of particular conduct is clearly established" and is examined "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. at 12. "The crucial question is whether public officials are on notice that their conduct is unlawful." *Nailon*, 715 App'x at 515–16. However, "[p]ublic officials could 'still be on notice that their conduct violates established law even in novel factual circumstances.'" *Gaspers*, 648 F.3d at 417 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Despite the Sixth Circuit's unexamined, footnoted pronouncement in 2008 that a child who had not engaged in protected speech could not assert a First Amendment retaliation claim, the court finds, based on the other precedent referenced, that it was clearly established as of July 2024, when the first alleged retaliatory act took place in this case, that a plaintiff may bring a First Amendment retaliation claim based on retaliatory action against her that is causally related to her close relative's protected speech. Odom and Barnhill were clearly on notice that it was not permissible to retaliate against Jane Doe based on her guardian's speech. They are not entitled to dismissal of Jane Doe's retaliation claims on qualified immunity grounds.

### 2. Failure to State a Claim

The defendants also seek dismissal of the First Amendment retaliation claims for failure to state a claim under Rule 12(b)(6), raising myriad arguments, several of them misconstruing the nature of the plaintiffs' claims. The plaintiffs' Response clarifies that: (1) both plaintiffs assert First Amendment retaliation claims against Odom only based on Odom's decision to "expel" Jane Doe from Mini Rockstars in retaliation for Mary Doe's reporting Jane Doe's abuse to DCS; (2) they bring First Amendment retaliation claims against Barnhill only based on Barnhill's decision to "expel" Jane Doe from TSU's EHS program altogether in retaliation for Mary Doe's continued

complaints about Jane Doe's abuse at Mini Rockstars and Trinity Way's decision to hire the Williams sisters; and (3) Mary Doe brings a First Amendment prior restraint claim against Odom and Jordan based on their allegedly prohibiting Mary Doe from speaking with anyone other than TSU's EHU staff about her concerns about any EHS program. The defendants' arguments in support of dismissal of these claims for failure to state a claim largely miss the mark.

### a) The Defendants' Arguments

The defendants target only the First Amendment retaliation claims and do not address the prior restraint claim. Generally, to succeed on a First Amendment retaliation claim, a plaintiff must show that: (1) she engaged in constitutionally protected speech, (2) the defendant took an adverse action against her that caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) the defendant's action was motivated, at least in part, by the plaintiff's exercise of her constitutional rights. *McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023) (citing *Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022)).

The defendants argue that the plaintiffs cannot establish that Mary Doe's "speech about an alleged abuser—a private person—is protected speech in these circumstances" because it did not qualify as criticism of public employees or officials. (Doc. No. 44 at 12, 11.) As the plaintiffs portray the incident to which the State Defendants refer, however, Jordan and Odom assumed that Mary Doe's speech about Mini Rockstars generally and the abuse that Jane Doe allegedly suffered there reflected badly on the TSU EHS program and put TSU's reputation at risk. (*See* SAC ¶ 113 (alleging that Odom "expressed frustration with how Mary Doe's actions affected their reputation and caused problems for them internally and with their partnership sites"); *id.* at 115 ("[I]t was clear to Mary Doe that Ms. Odom and Ms. Jordan's restraint on her speech was to protect TSU and its partner sites from legal liability and/or reputational harm.").) In other words, according to the plaintiffs, the defendants construed the speech as being about them. Moreover, the law is clear

that "[s]peech is generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words," and irrespective (outside the public employment context) of whether it is "about matters of public concern." *Jenkins*, 513 F.3d at 588 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992)); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 394 (2011) ("Outside the public employment context, constitutional protection for petitions does not necessarily turn on whether those petitions relate to a matter of public concern.").

The State Defendants also contend that the retaliation claims fail because the plaintiffs did not suffer an adverse action. Specifically, regarding the claim against Odom, the State Defendants contend that Jane Doe was not really "expelled" from Mini Rockstars. They assert that, if Jane Doe had actually been "expelled" at that time, she would have lost the EHS spot and been required to reapply for EHS services to enroll at Trinity Way, but she did not. (Doc. No. 44 at 14.) But these are the defendants' allegations; not the plaintiffs'. The court must accept as true the allegations in the SAC. And there, the plaintiffs plausibly allege that Jane Doe was expelled as a result of Mary Doe's reporting alleged sexual abuse at Mini Rockstars to DCS.[12] The defendants do not contend that Mary Doe's report to DCS was not protected speech.

Likewise, the State Defendants assert that the retaliation claims against Barnhill should not proceed against Barnhill either, because there was no adverse action. They insist that Barnhill's email makes it clear that she did not "expel" Jane Doe from the EHS program. Rather, Mary Doe had withdrawn Jane Doe from Trinity Way while the investigation against the Williams sisters

---

[12] After discovery, it may well become clear that Jane Doe did not suffer any harm as a result of the purported "expulsion" from Mini Rockstars. As suggested above, the pleadings gloss over the matter of whether and for how long Mary Doe withheld Jane Doe from Mini Rockstars after the reported abuse to DCS and when, exactly, Mini Rockstars closed. But these are factual issues the court must resolve in the plaintiffs' favor at this time.

proceeded, and Barnhill determined that the program could not hold Jane Doe's spot open indefinitely. (Doc. No. 44 at 15.) They also contend that Barnhill's email shows that the decision was not motivated by Mary Doe's speech. (*Id.* at 16.)

The court, while it accepts as true the fact that Barnhill emailed Mary Doe, does not accept as true the statements in the email, particularly when they are refuted by the plaintiff. Mary Doe insists that she had not decided to withdraw Jane Doe from Trinity Way and had not conveyed to anyone at TSU or Trinity Way that she had made such a decision, that TSU did not take reasonable steps to avoid removing Jane Doe from the program altogether, and that, even if Jane Doe was "aging out," TSU had an obligation to assist with her transition to a Head Start program. (*See* SAC ¶¶ 142–49.) The court finds that the SAC plausibly alleges that Barnhill expelled Jane Doe from the program and that such an expulsion qualifies as an "adverse action" for purposes of the First Amendment retaliation claim against Barnhill.

The State Defendants also argue that the plaintiffs do not adequately plead a causal connection between the protected speech and adverse actions, but this argument apparently conflates the prior restraint claim against Jordan and Odom with the retaliation claims against Barnhill. As set forth above, these are distinct claims. The plaintiffs do not bring a retaliation claim against Jordan at all, and the retaliation claim against Odom is premised upon Jane Doe's purported expulsion from Mini Rockstars, not her expulsion from TSU's EHS program altogether.

In sum, the Individual Defendants have not established that they are entitled to dismissal of the First Amendment retaliation or prior restrain claims against them set forth in Counts One and Two of the SAC.

### B. Count Three: Procedural Due Process Claim

Both plaintiffs bring a procedural due process claim against Barnhill. (SAC at 25.) In support of this claim, the plaintiffs assert that (1) they had a property interest in Jane Doe's

enrollment in the EHS program, at least through the end of the program year; (2) they did not receive adequate notice or a pre-deprivation hearing prior to Jane Doe's expulsion from the program; and (3) in light of her position, Barnhill knew or should have known that "depriving Plaintiffs of their property interest without adequate notice or a meaningful opportunity to be heard violated due process." (SAC ¶ 174.) Barnhill seeks dismissal of this claim on the grounds that the plaintiffs did not have a protected property interest in Jane Doe's enrollment in EHS and that they received all the process that they were due.

To establish a procedural due process claim in a § 1983 action, the plaintiffs must show that: (1) they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) they were deprived of this protected interest within the meaning of the Due Process Clause; and (3) the state did not afford them adequate procedural rights prior to depriving them of their protected interest. *Cooperrider v. Woods*, 127 F.4th 1019, 1042 (6th Cir. 2025); *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

To establish the existence of a protected property interest, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). Such property interests "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Id.* Thus, for example, the Supreme Court long ago recognized that individuals eligible for and receiving federal benefits, whose claims for payments are "grounded in the statute defining eligibility for them," have protected property rights. *Id.*; *see also Goldberg v. Kelly*, 397 U.S. 254 (1970) (holding that an individual receiving federal welfare assistance has a statutorily created property interest in the continued receipt of those benefits); *Mathews v. Eldridge*, 424 U.S. 319,

332 (1976) (protected property interest in Social Security disability benefits). Based on these principles, the Sixth Circuit has found that individuals eligible for and receiving Section 8 housing assistance have a protected property interest. *See Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 184 (6th Cir. 1984) (recognizing that participation in a public housing program is a property interest protected by due process). Generally speaking, "eligibility [for a public benefit], coupled with [a] present receipt of the assistance, creates a property interest." *Watson v. U.S. Dep't of Housing & Urban Dev.*, 645 F. Supp. 345, 348 (S.D. Ohio 1986).

On the other hand, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989)). Thus, for example, in *Castle Rock*, the Court held that the respondent did not have a protected property interest in police enforcement of a restraining order against her husband, despite the apparently mandatory wording of a statute regarding police enforcement of domestic restraining orders, in light of the "well established tradition of police discretion" that has "long coexisted with apparently mandatory arrest statutes." *Id.* at 760.

In *Thompson*, the Court noted that it had found that state regulations may create enforceable liberty and property interests in the prison setting, where the regulations "contain 'explicitly mandatory language.'" 490 U.S. at 463. As the Court "[s]tated simply," "'a State creates a protected liberty interest by placing substantive limitations on official discretion.'" *Id.* at 462 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). The use of the term "shall," for instance, has frequently been recognized as "limiting discretion" and "mandat[ing] that certain procedures be followed." *Id.* at 463 (collecting cases). However, the Kentucky prison regulations at issue in *Thompson*, defining categories of visitors who could be excluded from visitation, did not give

inmates a protected liberty interest in receiving visitors because they "lack[ed] the requisite relevant mandatory language." *Id.* at 464.

And in *Roth*, the Court held that a non-tenured professor at a public college with a one-year contract did not have a protected property interest in employment beyond the expiration of the one-year term, where the contract at issue "specifically provided that the respondent's employment was to terminate on June 30" and "made no provision for renewal whatsoever." 408 U.S. at 578.

The plaintiffs in this case insist that the EHS statute and regulations give rise to a protected property interest, insofar as they define eligibility largely based on objective financial criteria and then limit the discretion of administrators to remove eligible recipients from the program. There is no dispute in this case that Jane Doe, as a foster child, was eligible for participation in the EHS program. As the plaintiffs point out, by statute, a child who has been determined to be eligible and "who is participating in a Head Start program in a program year *shall be considered* to continue to meet the eligibility criteria through the end of the succeeding program year." 42 U.S.C. § 9840(a)(1)(B)(v) (emphasis added). Under the regulations, a "program *cannot* expel or unenroll a child from Head Start because of a child's behavior." 45 C.F.R. § 1302.17(b)(1) (emphasis added). Even when a child "exhibits persistent and serious behavioral concerns," a program "*must* explore all possible steps and document all steps taken to address such problems, and facilitate the child's safe participation in the program." *Id.* § 1302.17(b)(2) (emphasis added). The same provisions outlines certain minimum steps that "must" be taken in that situation. *Id.* Similarly, if a child ceases to attend a program, "the program *must* make appropriate efforts to reengage the family to resume attendance," including by, among other things, "[e]xamin[ing] barriers to regular attendance." *Id.* § 1302.16(a)(3), (a)(2)(v) (emphasis added). In other words, these regulations contain "explicitly

mandatory language" of the type the Supreme Court has found to create constitutionally protectable interests by "placing substantive limitations on official discretion," *Thompson*, 490 U.S. at 463, 462.

The defendants insist that a child's participation in a Head Start program is discretionary, pointing to language in the regulation pertaining to "determining, verifying, and documenting eligibility," which states that

> If a child is determined eligible under this section and is participating in a Head Start program, he or she will remain eligible through the end of the succeeding program year except that the Head Start program *may choose not to enroll* a child when there are *compelling reasons* for the child not to remain in Head Start, *such as when there is a change in the child's family income and there is a child with a greater need for Head Start services*.

*Id.* § 1302.12(j)(1) (emphasis added). That provision appears to apply only in limited circumstances, however, and the defendants do not even contend that it applies to Jane Doe's situation. At a minimum, there is a question of fact as to whether a compelling reason existed that granted such discretion to Barnhill in this particular case. The court finds, at least for purposes of the Motion to Dismiss, that the plaintiffs have adequately alleged the existence of a protected property interest.

"'Once it is determined that due process applies, the question remains what process is due.'" *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir. 1983) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Generally, "[p]rocedural due process requires notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner' if the State seeks to deprive someone of constitutionally protected liberty or property interests." *Hieber v. Oakland Cnty.*, 136 F.4th 308, 321 (6th Cir. 2025) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Morrissey*, 408 U.S. at 481).

Here, as alleged in the SAC, Barnhill provided the plaintiffs one day's notice and no opportunity to discuss or appeal the decision. The plaintiffs assert that this cursory notice was not sufficient and that, at a minimum, they were entitled to advance notice and an opportunity to be heard. (Doc. No. 66 at 31.) The defendants maintain that Jane Doe's "dismissal" from the program was "academic in nature," as a result of which no hearing of any kind was required. (Doc. No. 44 at 18.) The plaintiffs argue in response that Jane Doe's "expulsion" from the program was not academic in nature because it was not based on "'consideration of [Jane Doe's] personal attributes requiring the expert evaluation . . . and historic judgment of educators.'" (Doc. No. 66 at 30 (some internal quotation marks omitted) (quoting *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 875 (E.D. Mich. 2012)).) The State Defendants reply that Jane Doe was removed from the program due to non-attendance, which, under the regulations, is not considered an expulsion, and was therefore academic, rather than disciplinary, in nature. (Doc. No. 74 at 10–11.)

The court is not persuaded, at this juncture, that a distinction between an "academic" and a "disciplinary" termination of enrollment is relevant in a pre-kindergarten setting, particularly given that the regulations at issue require the EHS program to make and document substantial efforts to retain any child enrolled in the program, irrespective of whether the issue is attendance or behavioral problems—and given that the attendance issue in this case had nothing to do with Jane Doe's "personal attributes." *See Fuller*, 909 F. Supp. at 875 (noting that, "[w]hile there is no bright-line test for determining whether a dismissal is academic or disciplinary in nature," an academic dismissal "involves a school's consideration of a student's personal attributes").

Barnhill offers no other support for her argument that Jane Doe's disenrollment from the EHS program with one day's notice was sufficient for procedural due process purposes, and the

court finds that she has not established that dismissal of the plaintiffs' procedural due process claim is warranted under Rule 12(b)(6).

### C. Counts Four and Five: "Pre-Assault" and "Post-Assault" Title IX Claims

In Counts Four and Five, Jane Doe brings claims against TSU for violation of Title IX. Count Four, the "pre-assault" claim, asserts that TSU is liable to Jane Doe under Title IX because it had a policy of "deliberate indifference toward sexual harassment" as demonstrated by its "failure to train [its] employees regarding Title IX and failure to educate participants in the EHS Program about their rights under Title IX." (SAC ¶ 182.) As evidence of the failure to train, the plaintiffs point to Odom's telling Mary Doe that "no explicit policy required female caretakers to help female children with toileting" and her "brush[ing] off Mary Doe's concerns and [taking] no action to stop or correct Mr. Will's behavior." (*Id.* ¶ 183.)

In Count Five, the plaintiffs assert that TSU's response to being informed by Mary Doe of "Jane Doe's disclosure of abuse" was "clearly unreasonable," insofar as Odom responded with incredulity and questioned why Mary Doe has made a report to DCS; and TSU did not inform Mary Doe about "options for formal and informal actions," "TSU's responsibilities with respect to Jane Doe's disclosures," or the "existence of its Title IX coordinator"; did not conduct an investigation or "offer Jane Doe supportive measures"; and "allowed Jane Doe to be retaliated against by expelling her from both Mini Rockstars and its EHS Program." (*Id.* ¶¶ 188–89, 194–98.)

#### 1. *Legal Standards – Title IX*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The term "educational institution" includes "any public or private preschool." *Id.* § 1681(c). The

statute imposes a duty on educational institutions "not to discriminate on the basis of sex, which encompasses a teacher's sexual harassment of a student." *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 282 (1998)).

To state a claim under this provision based on sexual harassment (or sexual abuse) by a teacher, the student must plausibly allege that "(1) she was sexually harassed by a teacher or professor, (2) an official with authority to take corrective action had actual notice of the harassment, (3) the school's response was clearly unreasonable, and (4) the school's deliberate indifference caused her to suffer discrimination." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (citing *Gebser*, 524 U.S. at 290–91). "[D]eliberate indifference is shown where there is an official or other person with authority to take corrective action, who has 'actual knowledge of [the abuse] and fails adequately to respond.'" *Id.* (quoting *Gebser*, 524 U.S. at 290). And, in this context, a plaintiff can adequately plead causation by alleging facts showing that: "(1) following the school's unreasonable response (2) (a) the plaintiff experienced an additional instance of harassment or (b) an objectively reasonable fear of further harassment caused the plaintiff to take specific reasonable actions to avoid harassment, which deprived the plaintiff of the educational opportunities available to other students." *Id.* at 471.

### 2.  *"Pre-Assault" Claim*

TSU argues that the plaintiff fails to adequately plead a "pre-assault" claim because, prior to July 15, 2024, it had no notice of actual harassment or even a risk of sexual harassment; that the plaintiffs' conclusory failure-to-train allegations do not state a plausible claim; and a school's failure to comply with federal regulations on the publication of a sexual harassment policy and grievance features does not give rise to a private cause of action. (*See* Doc. No. 44 at 20–21.) More generally, with respect to both the pre- and post-assault Title IX claims, TSU maintains that the

plaintiffs fail to allege that Mini Rockstars was operated by TSU and that TSU cannot be vicariously liable for Mini Rockstars' alleged violation of Title IX.

The court finds, as a threshold matter, that the plaintiffs are not alleging vicarious liability but seek to hold TSU liable for its own failures to act. (*See* SAC ¶¶ 179–83 (alleging TSU's failure to train its own employees, failure to educate EHS participants, and failure to respond to Mary Doe's complaints to Odom specifically about Will Robinson prior to the alleged sexual abuse).)

Regardless, insofar as the plaintiffs, in the "pre-assault" claim, are attempting to impose liability on TSU for failure to prevent the sexual abuse before it occurred, that attempt fails. Mary Doe alleges that she complained to Odom about the Williams sisters in the fall of 2023, but the injuries Jane Doe sustained while in their class (bruises and a black eye) are not alleged to have had any sexual component. "For a report to provide actual notice, it must be one 'that can objectively be understood as alleging sexual harassment[.]'" *Doe v. N. Carolina State Univ.*, 125 F.4th 498, 505 (4th Cir. 2025) (quoting *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 264 (4th Cir. 2021)).

Around March 2024, approximately four months after Jane Doe was moved to Will Robinson's and Linda Robinson's class, Mary Doe began noticing unusual bruises and marks on Jane Doe's body that she reported to *Mini Rockstars*. (Id. ¶ 57.) The SAC does not allege that Mary Doe reported these injuries to TSU. In April 2024, Mary Doe learned from Jane Doe that Mr. Will had placed her on the toilet. When asked about this, Linda Robinson denied that it happened. When Mary Doe reported her concern about Mr. Will's assisting a female child with toileting to Odom, Odom replied that "no explicit policy required female caretakers to help female children with toileting" and brushed off Mary Doe's concerns. The plaintiff does not explain how the absence of such a policy constitutes deliberate indifference to the risk of sexual assault by male employees.

The court finds that it does not. *Accord Tilson v. Sch. Dist.*, No. 89-1923, 1990 WL 98932, at *7 (E.D. Pa. July 13, 1990) ("Failure to prohibit male teachers from escorting children in preschool programs to the lavatory did not reflect conscious or deliberate indifference to the need to prevent child abuse by the School District or Snead."), *aff'd*, 932 F.2d 961 (3d Cir. 1991).

Mary Doe had a conversation with *Mini Rockstars* personnel sometime in June about Jane Doe's concerning behavior, but not with TSU personnel. (SAC ¶ 69.) It was not until July 14, 2024 that Jane Doe allegedly made comments that Mary Doe construed as reports of sexual abuse, which Mary Doe reported to DCS and then to TSU. (SAC ¶¶ 73–74, 87.) The plaintiffs, in sum, do not adequately allege that any official at TSU "with authority to take corrective action had actual notice of the harassment" prior to July 15, 2024.

Insofar as the plaintiffs are attempting to impose liability on TSU based on conclusory allegations of TSU's failure to comply with federal regulations pertaining to hiring and safety practices, it is well established that an "alleged failure to comply with the [Title IX] regulations . . . does not establish . . . actual notice and deliberate indifference." *Gebser*, 524 U.S. at 291–92. Moreover, the Court has never held that "the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements." *Id.* at 292; *see also Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) (same).

In sum, TSU did not have prior notice of the sexual abuse by Robinson and, therefore, could not have been deliberately indifferent; nor could its deliberate indifference have caused the sexual abuse. Count Four, the plaintiffs' "pre-assault" Title IX claim, will be dismissed for failure to state a colorable claim.

### 3. *"Post-Assault" Claim*

TSU seeks dismissal of the "post-assault" Title IX claim on the basis that there was no harassment by a TSU employee; TSU had no authority to take corrective action against Robinson;

TSU was not deliberately indifferent in responding to the allegations of sexual abuse; and, regardless, the plaintiffs cannot establish the causation element.

The extent of TSU's control over Robinson, *per se*, is not relevant to the question of whether TSU had the ability to respond to allegations of sexual abuse at one of its EHS partner programs. As indicated above, the plaintiffs plausibly allege that it did. Regarding deliberate indifference, however, irrespective of whether TSU complied with its responsibilities, the facts as alleged in the SAC show that DCS performed an investigation, that Will Robinson was immediately removed from the classroom (SAC ¶ 103), and that Mini Rockstars closed shortly after Mary Doe reported abuse to DCS. The plaintiffs do not plausibly allege that TSU could have done much else under the circumstances—aside from facilitating Jane Doe's transfer to another EHS program, which it did.

Even assuming that the plaintiffs' allegations are sufficient to establish deliberate indifference, as set forth above, a plaintiff bringing a Title IX claim must show that "the school's deliberate indifference caused her to suffer discrimination." *Wamer*, 27 F.4th at 466. In the context of a teacher's harassment of a student, the plaintiff can establish causation by showing that, after the school's unreasonable response, *either* she "experienced an additional instance of harassment," *or* "an objectively reasonable fear of further harassment caused [her] to take specific reasonable actions to avoid harassment, which deprived the plaintiff of the educational opportunities available to other students." *Id.* at 471.

The plaintiff does not allege further sexual misconduct after her report. Instead, she maintains that she was "expelled" from Mini Rockstars after reporting sexual abuse by Robinson. But that action was allegedly taken by TSU in retaliation for Mary Doe's conduct protected by the First Amendment, as set forth above, or in retaliation for conduct protected by Title IX, discussed

below. The plaintiffs do *not* allege that Mary Doe withdrew Jane Doe from Mini Rockstars, even temporarily, because she or Jane Doe had an objectively reasonable fear of further harassment. Even if they did attempt to draw a causal connection between Mary Doe's withholding Jane Doe from Mini Rockstars and TSU's deliberate indifference, they also allege that Will Robinson was removed from the classroom during DCS's investigation (SAC ¶ 103), so they cannot establish that any fear of continued sexual abuse was objectively reasonable. Applying *Wamer*'s formulation of the *prima facie* elements of a Title IX discrimination claim in the context of a teacher's harassment of a student, the court finds that the plaintiffs do not allege facts that establish the causation element for their post-assault claim. This claim, too, will be dismissed for failure to state a claim.

### D. Count Six: Title IX Retaliation Claim

Both plaintiffs bring retaliation claims against TSU, asserting that TSU expelled Jane Doe from Mini Rockstars and later from the EHS program altogether in retaliation for Mary Doe's protected conduct.

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The elements of a Title IX retaliation claim, typically, are that (1) the plaintiff engages in activity protected by Title IX; (2) the educational institution knew about the protected activity; and (3) the plaintiff suffers an adverse action that is causally related to the protected activity. *See Doe v. Univ. of Ky.*, 111 F.4th 705, 716 (6th Cir. 2024).

### 1.     Mary Doe's Standing

TSU seeks dismissal of these claims on the grounds that, because Mary Doe is not the beneficiary of a federally funded program, she lacks standing to bring a Title IX claim on her own behalf. The court is not persuaded.

The U.S. Constitution limits federal courts' jurisdiction to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. "[T]o bring a case, a plaintiff must have standing." *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 350 (6th Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). To have standing, "the plaintiff must have a personal stake in the case." *TransUnion*, 594 U.S. at 423 (internal quotation marks omitted). "This is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that the defendant caused, and (3) that the court can redress with a decision in the plaintiff's favor." *Mackinac Ctr.*, 102 F.4th at 350 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

In *Jackson*, the Court expressly recognized that the Title IX statute "is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." *Jackson*, 544 U.S. at 176. In addition, the Court noted that it had previously "made clear that retaliation claims extend to those who oppose discrimination against others." *Id.* (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969), *abrogated on other grounds by Ziglar v. Abbasi*, 582 U.S.120 (2017)).

The court has reviewed the cases cited by TSU for the proposition that a parent has no standing to pursue a Title IX claim and finds them neither binding nor persuasive. As the plaintiffs point out, the cited cases are distinguishable from this case, either because they did not involve claims for Title IX retaliation or the plaintiff conceded that the parent lacked standing, or both. *See, e.g.*, *Phillips v. Anderson Cnty. Bd. of Educ.*, 259 F. App'x 842, 843 & n.1 (6th Cir. 2008)

(identifying the case as a "sex discrimination case" under Title IX and noting that the plaintiff, who was no longer a minor, "concede[d] on appeal that that the district court correctly dismissed her father" who, as a parent, "lack[ed] standing to assert a Title IX claim"); *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 CS, 2012 WL 4477552, at \*18 (S.D.N.Y. Sept. 27, 2012) (holding that parents lacked standing to assert Title IX harassment claims on their own behalf (collecting cases)). In *Wise v. East Grand Rapids Public School District*, the district court indeed dismissed the parents' Title IX retaliation claims, relying on *Phillips* and *HB*, but without discussion of the fact that neither of those cases involved retaliation claims. *Wise*, No. 1:20-cv-1263, 2022 U.S. Dist. LEXIS 123276, at \*10 (W.D. Mich. July 12, 2022). *Wise* also cited *Davis v. Folsom Cordova Unified School District* in support of its decision, but that case found it "conceivable" that a plaintiff could "bring a retaliation claim under Title IX even though he was not a member of the protected class. This is so because the victim of retaliation in violation of Title IX does not have to be a member of the class." *Davis*, No. CIV S-11-1242 KJM, 2012 WL 592055, at \*7 (E.D. Cal. Feb. 22, 2012) (citing *Jackson*, 544 U.S. at 179, and collecting other cases holding that parents can have standing to bring Title IX retaliation claims).

Numerous other courts, in fact, have concluded that standing to bring a Title IX retaliation claim is not limited to the person who suffered discrimination. *See, e.g.*, *Potera-Haskins v. Gamble*, 519 F. Supp. 2d 1110, 1117–18 (D. Mont. 2007) ("It is not required that a victim of retaliation for complaining about discrimination be the subject of the original complaint; that is, a reliable claim can arise if one complains about the discriminatory treatment of others, and is retaliated against as a result."), *aff'd* 447 F. App'x 813 (9th Cir. 2011); *Jones v. Beverly Hills Unified Sch. Dist.*, No. WD CV 08-7201-JFW (PJW), 2010 WL 1222016, at \*4 (C.D. Cal. Mar. 24, 2010) ("Unlike her equal treatment claim, Plaintiff Mary Jones could conceivably bring a

retaliation claim under Title IX even though she was not a member of the protected class because, under the law, the victim of the retaliation does not have to be a member of the class.") , *report and recommendation adopted*, No. WDCV 08-7201JFWPJW, 2010 WL 1222023 (C.D. Cal. Mar. 25, 2010); *Berdy v. Wayne State Univ.*, No. 05-70691, 2006 WL 2583251, at \*4 (E.D. Mich. Sept. 7, 2006) ("Therefore, Title IX protection extends to those who complain about discrimination against others.").

The threshold standing requirement, in any event, is that the plaintiff suffer a cognizable injury—that she have "a personal stake in the case." *TransUnion*, 594 U.S. at 423 (internal quotation marks omitted). Here, Mary Doe allegedly complained about purported discrimination against Jane Doe, and she affirmatively asserts her own injury arising from Jane Doe's expulsion from EHS (*see* SAC ¶ 207), presumably because she herself lost the financial benefit of federally subsidized child care for the child in her care. Under these circumstances, and in light of the caselaw referenced above, this court finds that, at least for purposes of the Motion to Dismiss, Mary Doe has plausibly alleged that she suffered her own injury in fact— "namely that she had a right to be free of retaliation"—for reporting Jane Doe's harassment to DCS and to TSU. *Accord Doe v. USD No. 237 Smith Ctr. Sch. Dist.*, No. 16-CV-2801-JWL-TJJ, 2017 WL 3839416, at \*9 (D. Kan. Sept. 1, 2017) (reaching the same conclusion in the context of a motion to amend).

These allegations are sufficient at this stage to establish standing, and TSU's motion to dismiss Mary Doe's Title IX retaliation claim under Rule 12(b)(1) will be denied.

2.      *Jane Doe's Claim*

TSU also asserts that Jane Doe's retaliation claim fails on the first element of the claim: she cannot show that she personally engaged in protected conduct and cannot bring a retaliation claim premised on Mary Doe's protected conduct. TSU also asserts that Jane Doe did not suffer an adverse action and that there was no causal connection between Mary Doe's protected activity

and "action taken by TSU." (Doc. No. 44 at 24–25.) These latter arguments, also raised in response to the First Amendment retaliation claims, are based on TSU's version of the facts, which the court will not consider in the context of addressing a Rule 12(b)(6) motion.

As for whether Jane Doe can bring a retaliation claim based on protected activity in which Mary Doe engaged, the Ninth Circuit, at least, has expressly recognized a "zone of interest" theory of recovery in this type of situation, finding that plaintiffs who alleged that a school retaliated against them (through firing their coach, which caused them cognizable injuries) in response to Title IX complaints made by a coach on their behalf may bring Title IX retaliation claims. *See Ollier v. Sweetwater Union High Sch.*, 768 F.3d 843, 865–66 (9th Cir. 2014) (citing *Jackson*, 544 U.S. at 181, as observing that "teachers and coaches . . . are often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators"). Here, Jane Doe alleges that she suffered an injury—being expelled from Mini Rockstars and then from the EHS program—that was causally related to Mary Doe's complaints on Jane Doe's behalf about sex discrimination suffered by Jane Doe. The court finds, at this juncture, that Jane Doe may bring a claim premised upon Mary Doe's engaging in protected activity on her behalf. The motion to dismiss this claim will be denied.

## V.    CONCLUSION

For the reasons set forth herein, the State Defendants' Motion to Dismiss (Doc. No. 43) will be granted in part and denied in part. The motion will be granted as to Jane Doe's "pre-assault" and "post-assault" Title IX claims against TSU, Counts Four and Five of the SAC, and otherwise denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge